# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TIM FLAHERTY, ANIELLO ZAMPELLA, JAKE FLAHERTY, PAIGE LARKIN, STEPHAN OSSELLO, and ROBERT RAWSON, derivatively on behalf of DNA HOLDINGS VENTURE, INC.,

          Derivative Plaintiffs,

      v.

BROCK PIERCE and SCOTT WALKER, and DNA HOLDINGS VENTURE, INC., a nominal defendant,

          Defendants,

)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

**JURY DEMAND**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     For more than a decade, Brock Pierce and Scott Walker have worked together to enrich themselves at the expense of their investors, employees, and contractors who mistakenly viewed them as luminaries in the Cryptocurrency industry with specific insight as to which new Crypto projects were likely to succeed. Rather, Pierce and Walker made some good bets in the early wild west days of Crypto, but have not matured with the industry. Instead, the growth and sophistication of the blockchain industry and technology has passed them by, leaving them to run pump and dump schemes between drug and alcohol induced benders and illegal high stakes poker games. Most significantly for this Complaint, they:

- Solicited investment in DNA Holdings Venture, Inc. ("DNA");

- Promised investors they would contribute over $100 million in personal assets to DNA (the "Assets");

- Sent investors an agreement whereby the agreed to contribute such Assets to DNA in exchange for preferred shares in DNA;

- Contributed the Assets pursuant to a secret agreement, not disclosed to investors, containing a provision allowing them to take back the Assets if DNA did not merge

with a public entity within six months;

- Sabotaged DNA's ability to effectuate such a merger; and

- Told investors they were going to take the Assets back and leave DNA insolvent.

As Crypto continues to grow up, it needs to put fraudsters like Pierce and Walker in its rearview mirror for good.

## **PARTIES**

2. Derivative Plaintiff Tim Flaherty is an individual residing in Arizona. Tim Flaherty has been a shareholder of DNA continuously since April 2024 and was a shareholder at the time of each transaction and wrongful act complained of herein. Tim Flaherty continues to hold his ownership interest in DNA throughout this litigation.

3. Derivative Plaintiff Aniello Zampella is an individual residing in Puerto Rico. Zampella has been a shareholder of DNA continuously since sometime in 2024 and was a shareholder at the time of each transaction and wrongful act complained of herein. Zampella continues to hold his ownership interest in DNA throughout this litigation.

4. Derivative Plaintiff Jake Flaherty is an individual residing in Arizona. Flaherty has been a shareholder of DNA continuously since approximately December 2024 and was a shareholder at the time of each transaction and wrongful act complained of herein. Flaherty continues to hold his ownership interest in DNA throughout this litigation.

5. Derivative Plaintiff Paige Larkin is an individual residing in Arizona. Larkin has been a shareholder of DNA continuously since April 2024 and was a shareholder at the time of each transaction and wrongful act complained of herein. Larkin continues to hold his ownership interest in DNA throughout this litigation.

6. Derivative Plaintiff Stephan Ossello is an individual residing in Idaho. Ossello has been a shareholder of DNA continuously since April 2024 and was a shareholder at the time of

each transaction and wrongful act complained of herein. Ossello continues to hold his ownership interest in DNA throughout this litigation.

7. Derivative Plaintiff Robert Rawson is an individual residing in Australia. Rawson has been a shareholder of DNA continuously since sometime in 2024 and was a shareholder at the time of each transaction and wrongful act complained of herein. Rawson continues to hold his ownership interest in DNA throughout this litigation.

8. Defendant Scott Walker is an individual residing at La Plaza Stella, 1362 Av Magdalena, PH 1904, San Juan, PR 00907.

9. Defendant Brock Pierce is an individual residing at 902 Villa Dorado Estates, Dorado, PR 00646.

10. Nominal Defendant DNA Holdings Venture, Inc. ("DNA" or the "Company") is a company organized and existing under applicable law with its principal place of business in Puerto Rico. DNA is named as a nominal defendant solely because it is the entity on whose behalf this derivative action is brought. DNA is the real party in interest as the ultimate beneficiary of any recovery in this action. Any damages recovered herein shall be paid to DNA.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964(c), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claims as to form part of the same case or controversy.

12. Venue is proper and the Court has personal jurisdiction over the Defendants because a substantial part of the events or omissions giving rise to the claim occurred in Tennessee and the Defendants committed tortious acts in the State of Tennessee.

## FACTS

### I.  Brief History of Crypto Currency

13.  Cryptocurrency (colloquially "Crypto") is the general name for a digital currency designed to work through a computer network without reliance on any central authority. Individual coin ownership records are stored in a digital ledger or "blockchain," a computerized database maintains transaction records to verify coin ownership. Bitcoin was the first cryptocurrency, released in 2009, and remains the most well-known. As of June 2023, there were more than 25,000 other cryptocurrencies in the marketplace and, according to Wikipedia, as of April 2025, the cryptocurrency market capitalization was estimated at US$2.8 trillion.

14.  Since its foundation, Crypto has been viewed skeptically by much of the mainstream media marketplace. Once routinely described as a financial tool of criminals and the black market or a Ponzi scheme, over the years, Crypto has grown more reputable. In April 2021, Coinbase, a Crypto exchange became a publicly traded company in the United States on the NASDAQ exchange with an initial market capitalization of $85 billion. On June 9, 2021, El Salvador became the first country to adopt bitcoin as legal tender. Crypto was becoming mainstream.

15.  A new type of Crypto called a "stable coin" has also come to prominence. Rather than float in the market, stable coins are pegged to the value of the U.S. dollar. The most well known stable coin is called Tether, which has surpassed Bitcoin as the most traded global cryptocurrency. In 2024, Cantor Fitzgerald CEO Howard Ludnick confirmed that Cantor is the custodian of Tether's U.S. Treasury reserves, reportedly in excess of $97.6 billion. Tether is currently in the middle of a capital raise at a valuation of $500 billion.

## II.  DNA I

### A.  Early Business Deals Between Pierce and Walker

16.  Defendant Brock Jeffrey Pierce is a former child actor who appeared in Disney films including *The Mighty Ducks* (1992) and *D2: The Mighty Ducks* (1994).  After acting, he became a video game entrepreneur and then ventured into Crypto.  He was elected as a Director of the Bitcoin Foundation in 2014 and is a co-founder of Tether, a U.S. dollar–pegged stablecoin project.  He is also the person who presented Jeffrey Epstein with the opportunity to invest $3 million in Coinbase before its IPO, which may have netted Epstein's estate up to $100 million, and lived with convicted pedophile Marc Collins-Rector, who was also Pierce's business partner for several years.  In 2018, HBO's *Last Week Tonight With John Oliver* called Pierce a "creepy cowboy from the future," described his "entirely unicorn wedding" at Burning Man, and showed him promoting a company with the line, "Everything that exists is no longer going to exist in the way that it does today… Everything in this world is about to be better."  Pierce also ran for U.S. President as an independent candidate in 2020.

17.  Defendant Scott Walker began his tech career in 1995 founding NetPage Communications, an early web-hosting company. After selling it in 1997, he continued as a serial entrepreneur with companies including, but not limited to "www.content.ad," a "$50m+ online 'Native Advertising' agency," and Extrinsic, Inc., a digital content and online marketing service.

18.  Walker and Pierce began working together in the Crypto industry in 2012 when they co-invested in a bitcoin mining operation.  In Walker's words, he and Pierce were "early stage ICO investors" who helped launch crypto projects "since 2013."  In that year, Pierce co-founded Crypto Currency Partners, along with brother P. Bart and W. Bradford Stephens and with Walker as a founding limited partner.  Crypto Currency Partners was one of the first venture capital firms

focused on Crypto investments. In 2015, Crypto Currency Partners rebranded as Blockchain Capital. Blockchain invested in many significant Crypto companies including, but not limited to Kraken, Ethereum, Coinbase, and Tether.

19. During the same time period, Pierce and Walker began working on Initial Coin Offerings, known in the Crypto industry as "ICOs." ICOs are a method of raising capital where a Crypto startup sells digital tokens using blockchain technology to investors. Essentially, instead of selling stock, the company sales digital tokens or "coins." Pierce was one of the founders of Mastercoin and Pierce and Walker worked together to lead Mastercoin's public fundraise in July 2013, representing the first ICO. Mastercoin represented the technological foundation for Tether, of which Pierce was a co-founder. A year later, in 2014, the Ethereum ICO (without Pierce or Walker) raised $18.3 million, setting the stage for an ICO boom in the years that followed.

20. Unfortunately, not all coins launched as part of an ICO represent real companies. The most well known is "Dogecoin," which launched as a joke based on an internet meme of a dog in December 2013 to make fun of the wild speculation in nascent cryptocurrencies. Dogecoin increased in value by 300% in 72 hours in December 2013, then dropped by 80% three days later. But despite the lack of any actual company underlying Dogecoin, it continues to exist, with a peak market capitalization of $50 billion in 2021 following tweets about it by Elon Musk.

21. The ICO market, where a joke could turn into $50 billion, was ripe for investor abuse. As a result, Pierce left Blockchain and formed a new company with Walker, known colloquially as DNA (and, with DNA Holdings Ventures, Inc., "DNA"),[1] in 2017. Pierce and Walker marketed DNA as a "crypto venture fund" that "provides investment and consulting for

---

[1] It is unclear if the 2017 DNA is the same legal entity as DNA Ventures Holdings, LLC, but the distinction is immaterial for this lawsuit.

the world's top crypto projects."

22. ICO activity peaked, with over $6 billion raised, that same year. During this time period, according to the DNA website, Walker and Pierce co-founded and invested in Block.one/EOS, an ICO that raised $4 billion – still the largest ICO in history. The price of one EOS token peaked at $22.89 in April of 2018, with a total market cap of over $17 billion. Today, EOS has lost more than 99% of its value, with an EOS token (now renamed Vaulta) priced around 8 cents. But DNA and its investors apparently got out early, as the today, the DNA website boasts of "Over a 100X return to the team's investment" in Block.one/EOS. DNA also invested in Hedera Hashgraph and achieved a return of "50X to the team." Of course, it is unclear where Walker and Pierce end and DNA begins as they have operated, and continue to operate, DNA as their alter ego. So the investments touted on the DNA website may be Walker/Pierce personal investments, DNA corporate investments, or some combination of the two.

**B.      Walker and Pierce Get Sued - Repeatedly**

23. Walker and Pierce also used DNA to invest in and/or advise a number of less reputable projects. For instance, in 2017 and 2018, a project known as Blockchain Terminal (sometimes referenced through its ICO token, "BCT") was marketed and promoted in the digital-asset ecosystem, and later became the subject of a federal securities enforcement action alleging fraud. And a 2019 report discussing marketing for Blockchain Terminal stated that "BCT's advisors at DNA Fund (Scott Walker and Brock Pierce)" provided advice regarding marketing and roadshow activities – problematic issues that resurface later as described below.

24. In the fall of 2018, Pierce and Walker became involved in a project called Casper

Labs. According to a lawsuit filed against them in July 2021,[2] Walker, Pierce, and others fraudulent inducted the founder of Casper Labs, Mr. Vlad Zamfir, to allow them to use his name and image in their own marketing campaigns in exchange for "fundraising services and to source and close donations from third parties." While Walker and Pierce proceed to use Zamfir's likeness in their marketing, they never raised any money for Casper Labs: "Although Defendant Walker repeatedly informed Mr. Zamfir of sponsors supposedly interested in supporting his Casper research, no funds ever materialized." According to the lawsuit, Walker later entered into an agreement with Casper where 7% of all Casper tokens would be split between himself and three other individuals, with disclosure to the public market. Further, and also according to the lawsuit, "[u]pon information and belief, the [] coins [provided to Walker for free] are among the first to become freely tradeable." Then, Pierce (and others) allegedly "paid persons and entities on YouTube and elsewhere to promote the purported merits of the CasperLabs coins. These promoters rarely revealed that they were paid endorsers of CasperLabs." "Beginning on or about May 6, 2021, IOU token sales and the [] Brock Pierce [] promotion campaign drove the price of the 'Casper' coin, which was still untradeable, from approximately $1 to more than $20." When trading finally began on the 'Casper' coins, "[a]pproximately 590,000,000 'Casper' coins sold between May 11 and May 12, 2021. Despite the broad sell-off, Executive Defendants, Brock Pierce, and Swiss Board Defendants dumped approximately 120,000,000 to 140,000,000 'Casper' coins onto the cooperating exchanges [], further driving down prices." The lawsuit was voluntarily dismissed shortly after it was filed.

25. Pierce was also sued in May 2020 as part of a securities class action lawsuit arising

---

[2] *Coordination Technology Ltd. v. CasperLabs LLC, et al.* (Case No. 21-cv-01295) (S.D. Cal. July 19, 2021), Original Complaint.

out of allegations that Pierce (and others) misled investors concerning Block.one/EOS. For instance, "[o]On March 12, 2018, before Defendants had any functional software, former Block.one partner Brock Pierce said about EOS:

> Everything will be better, faster, and cheaper. Everything will be more connected. Everything will be more trustworthy. Everything will be more secure. Everything that exists is no longer going to exist in the way that it does today. Everything in this world is about to get better.

In fact, the lawsuit alleged,

> This statement was false and misleading because, in fact, the EOS Blockchain was not more trustworthy and secure. In fact, it did not possess the key feature that would make it trustworthy and secure: decentralization. In particular, Defendants failed to disclose that the EOS Blockchain governance system consisting of a revolving door "block producers" could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts. In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared to be controlled by a small group of "Chinese oligarchs."

Ultimately, the lawsuit resulted in a $22 million settlement.

26.    Walker and Pierce were also sued in Nevada in 2022 in connection with a transaction wherein the Plaintiff invested in Wax tokens, Everpedia tokens, and Ethereum through Walker and Pierce's DNA entity. According to the lawsuit, Pierce and Walker refused to transfer control of the tokens acquired to the Plaintiff, which would have allowed him to sell the tokens. Instead, he was forced to watch the value of the tokens decline without being able to take any action.

27.    Walker and Pierce were also "advisors" to Blockchain Terminal, a notoriously fraudulent company and ICO. Pierce and Walker used DNA to promote Blockchain Terminal at Crypto Invest Summit LA in 2018. It turns out that Blockchain Terminal was run by a convicted Canadian fraudster, Boaz Manor, using a fake name who had previously bilked investors out of $800 million. While neither Walker, nor Pierce, appear to have been sued in connection with their

work for Blockchain Terminal, Manor and some of his associates were indicted in 2020 after investors lost all of their money.

### III. Illegal Gambling Activities

28.     As part of their scheme to mislead potential investors and business partners about their supposed success and status as Crypto luminaries, Pierce and Walker hosted two illegal high stakes Crypto poker games at Pierce's home in Dorado, Puerto Rico in 2021.  The first in October and the second during Puerto Rico BlockChain Week in December 2021.  Walker started a WhatsApp chat group to pr0omote the events, the first of which included a "1.0 [bitcoin] buy in" game.  Walker and Pierce worked with "Jacob L," "Limitless Pedro," "Lee Jones," "Poker Unicorns," "Zach Resnick," "Charles," "Austin," "Sam," "Quin," and multiple other people to promote and run the games.  The second game, on or around December 9, 2021, was purportedly to benefit the "Integro Foundation," a non-profit where Pierce serves as the Chairman, with Integro getting a minimum of $1,000 per entrant.

29.     Approximately one week before the event, nearly 50 people had signed up.  The event promoters promised to give people additional chips for both the tournament and a side cash game if they referred guests who signed up to participate including $250 for each tournament entry. The highest stakes cash game had a  minimum buy in of $100, 000 and the organizer expected participants would fill two tables and buy in "for $200k from the sound of it, but we are not limiting max buy in for those tables."  Despite the more the rake of tens of thousands of dollars going from the game to a charity and the additional money promised to players from the promoters, the poker game was not registered with the Puerto Rican Gaming Authority.

30.     The game took place as scheduled on December 9, 2021, with millions of dollars gambled across all tables.  The 1 bitcoin entry fee for the tournament was paid into one of the

organizer's crypto wallets. On information and belief, cash game entry fees were also paid in crypto currency into an organizer's crypto wallet.

31. The following day, December 10, 2021, one of the participants in the game reported that his iPhone had been hacked through the wifi network created for game participants and his sim was "swapped," giving the hackers access to his email and social media accounts. Others quickly reported that none of the winners received their payouts. Rather, on December 10, 2021, Resnick purportedly received a message from "Jacob" wherein Jacob admitted to stealing all of the money and said he was giving it to his family and committing suicide. All participants were skeptical of the story.

32. It is now more than four years later. Jacob has never been found and the money (on information and belief, $2-$3 million) never recovered. On information and belief, the charity did not receive anything. On information and belief, despite multiple requests from game participants, neither Pierce nor Walker ever called the FBI to report the theft.[3]

## IV. Crypto Knights

33. Mike Miglio is a cryptocurrency attorney, entrepreneur, and blockchain innovator known for his work at the intersection of law and decentralized technology. He is the co-founder of the crypto-focused law firm Wolfe Miglio and previously helped launch ICO Law Group in 2017, two of the early legal practices dedicated to advising blockchain startups, token offerings, and cryptocurrency exchanges during the early cryptocurrency era. Miglio earned his Juris Doctor from Indiana University Maurer School of Law and has worked internationally in Bangkok and Singapore. Beyond legal practice, Miglio is a pioneer in decentralized finance infrastructure as

---

[3] Neither Walker, nor Pierce are suspected of stealing the millions of dollars in Crytpo from the poker game.

both a founder and an investor of highly technical blockchain based companies. His career centers on helping emerging blockchain projects navigate complex regulatory environments while advancing decentralized financial systems.

34.     In or about June 2024, Miglio was approached and selected to appear as a contestant on a television program titled "Crypto Knights," a Shark Tank style reality show in which founders of crypto-related startups pitch their businesses to a panel of prominent crypto-industry investors identified on the program as "Knights." After Miglio was cast, and unrelated to Miglio, Brock Pierce agreed to participate as one of the show's featured "Knights," serving as an on-camera judge and prospective investor.

35.     The show's format required contestants to present live pitches and negotiate potential investments from the Knights on camera. The negotiations and investment discussions were unscripted and live, without rehearsals or re-shoots, and the offers made on the program were presented as real commitments. More than twenty contestants pitched during filming. When Miglio appeared to pitch his company, it was disclosed on air that Miglio and Pierce knew each other through their overlapping residency and social circles in Puerto Rico. At the time of filming in or about August 2024, Miglio and Pierce had no prior professional relationship and were, at most, acquaintances who had interacted briefly on a handful of occasions at events or gatherings.

36.     At the end of Miglio's pitch, live on the show, Pierce was the first to speak. Pierce stated that he loved Miglio's company ("DEIN"), that it was an innovative solution to a problem that sorely needed to be solved within crypto. Pierce offered Miglio, live on recording, to fill the entire $750,000 fundraising round that Miglio was raising on the show. Pierce then stated that if any of the other four "Knights" wanted to join the fundraising round, he would be willing to lower his investment to make room for them. All four of the other investors expressed interest to varying

degrees, and Pierce lowered his commitment to $250,000 in total.

37. After filming, Miglio followed up with the "Knights" concerning the proposed investments. Pierce, however, was unresponsive for weeks. Miglio sought assistance from the show's directors to obtain a response from Pierce, and both Miglio and the directors attempted over the ensuing months to confirm and document Pierce's on-camera investment commitment. The directors advised Miglio that Pierce was not responding to them either, and stated that absent follow-through they would be forced to address publicly that Pierce was not honoring the investment commitments made on the program. Shortly thereafter, Pierce took steps to manage the situation by (i) creating a group chat that included Miglio and representatives of DNA in connection with the proposed investment, even though DNA had not agreed to assume Pierce's commitment, and (ii) representing to the show's directors that he and or DNA would support the show financially and assist with introductions through Pierce's entertainment-industry contacts in connection with efforts to secure a second season.

38. The group chat did not result in Pierce honoring the on-camera investment commitment. DNA informed Miglio that DNA would not assume or guarantee Pierce's investment obligation, and Pierce remained largely silent despite Miglio's repeated attempts to obtain a definitive answer. Instead of assuming Pierce's investment obligation, DNA made Miglio an objectively terrible offer wherein they asked for 1-2% of Miglio's company and in return they would try to help Miglio raise funds from other potential investors (not Pierce), however they would not invest themselves; Miglio declined. Miglio reiterated that Pierce's failure to follow through reflected poorly on him and DNA, and that Pierce or DNA should complete the investment. In lieu of funding, DNA made a final offer to list DEIN on a webpage within DNA's "Deal Desk," a platform where accredited investors can purportedly invest alongside DNA in

portfolio companies. At this point, Miglio accepted their offer to be put on the webpage because it cost him nothing and it represented a small chance at raising some funding after all he had been put through, however DNA did not invest in DEIN, DNA did not meaningfully market DEIN to investors through the Deal Desk, and no capital was raised for DEIN through that channel.

39. Miglio ultimately stopped pressing Pierce to fulfill the commitment to avoid escalating a conflict with Pierce. This unresolved issue later resurfaced when Miglio was approached to join DNA, at which time Pierce and Walker made vague but emphatic assurances that they would improve DEIN's financial situation and help raise capital, including statements to the effect that Miglio's affiliation with DNA would be a key factor in DEIN's success. However, once Miglio joined DNA, Walker told Miglio that he should abandon DEIN and focus full-time on DNA instead, stating that DEIN did not have anywhere near enough capital to make it (largely because Pierce did not fund his commitment and DNA ultimately did not help DEIN the way they promised they would).

40. Regarding the investment into Crypto Knights that Pierce promised the show, this was again shifted into a "DNA deal" instead of Pierce taking personal responsibility for it. The show relied on the promise that Pierce and DNA would make this investment, and they aired the show without exposing Pierce's failure to invest. On the show, Pierce made more than 8 investment commitments in projects, often promising the most amount of money of any of the investors, making himself look wealthy and eccentric on the show. On information and belief, as of a year after the show, Pierce has not fulfilled any of his investment obligations, to the detriment of the projects that relied on his promises to invest.

## V. DNA II

### A. Walker and Pierce Relaunch DNA

41. Despite all of the lawsuits filed against them and their poker game resulting in the theft of millions of dollars, Pierce and Walker remained well-known figures in the Crypto industry. So, in 2024, Pierce and Walker created a traveling meeting and party venue dubbed "DNA House" that they took around the world to solicit investment in a revamped DNA and promote ICOs that paid them to make sham investments in various tokens. Pierce and Walker refined their pitch throughout 2024 beginning on a private yacht they rented for TOKEN2049 Dubai on April 18–19, 2024. Derivative Plaintiff Jake Flaherty attended TOKEN2049 on DNA's behalf and officially became a DNA employee in May 2024. Pierce and Walker awarded Jake Flaherty 375,000 options at a company valuation of $25 million and told him, through Chris Miglino, the DNA CEO at the time, that DNA would be going public within a year or two at a valuation of between $300 million and $1 billion, so Flaherty's options would be really valuable.

42. Also in mid-2024, Plaintiff Tim Flaherty met Walker, who told him that he, Pierce, and DNA had been incredibly successful investing in Crypto projects between 2015 and 2019. Walker said they took a break between 2019 and 2024 due to a bear crypto market and told their employees to "go to the beach." However, with a strong Crypto bull market in 2024, Walker said they planned to put the band back together and launch "DNA 2.0." Walker said he and Pierce would both source deals from their networks and that all good Crypto deals go through either him or Pierce because of their great reputation in the industry. At no point did Walker tell Tim Flaherty that "DNA 1.0" actually lost money for its investors. Flaherty and his wife, Paige Larkin, agreed to invest $750,000 and wired the money in April 2024. Flaherty's friend Briston Peterson invested

p. 15

$250,000.[4]

43. Meanwhile, in early 2021, Thomas McLaughlin founded Coral Capital Management, LLC ("Coral"). Coral operated as an asset manager giving investors exposure to blockchain investments. Walker became Coral second largest investor, and McLaughlin got to know him on a personal level, playing golf and attending hockey games together and taking many social trips. By 2024, Coral had raised $2.57 million in GP capital to cover its expenses and had $125 million in assets under management after completing a capital raise at a $40 million valuation. McLaughlin owned 33.3% of Coral before the capital raise and 27% of Coral after the capital raise. With the relaunch of DNA, McLaughlin and Walker entered into discussions and negotiations concerning a potential acquisition of Coral by DNA with the shared belief that DNA and Coral would be more valuable together than each was separately with DNA providing a venture track record and brand presence, while Coral would operate and manage liquid strategies and day-to-day business operations. McLaughlin brought his whole team to Consensus Austin to meet Walker and Pierce's newly formed DNA team.

**B.    Misrepresentations at Bitcoin 2024 in Nashville**

44. Walker and McLaughlin's conversations continued into the biggest Crypto conference of 2024—Bitcoin 2024 in Nashville, Tennessee from July 25 to 27. The annual Bitcoin conference brings together almost all major participants in the Crypto industry, and 2024 was no different. Featuring speeches by President Trump and HHS Secretary Kennedy, Bitcoin 2024 included dozens of panels and presentations on the evolution of Crypto. The conference attracted thousands of participants from across the United States and around the world. Pierce and Walker

---

[4] Flaherty's wife, Paige Larkin, and Peterson's entity, Point Golf Markers, LLC have assigned Flaherty the right to pursue any and all causes of action against Pierce and Walker.

were both there, running their own parallel conference and party at DNA House, which occurred at the Cannery House in downtown Nashville.

45. DNA House represented a grand smoke and mirror show by Walker and Pierce. Featuring a mechanical bull, multiple DJs playing in multiple rooms, live bands, and open bars, DNA House gave the false impression that Walker and Pierce had created an extremely financially successful entity. In fact, DNA's previous investors (other than Walker and Pierce) had never received any return on capital.

46. Walker told McLaughlin that DNA was about to go public through a reverse merge transaction with a company called SRAX and the combined company would have immense value because Walker and Pierce were about to inject between approximately $100 million of assets (the "Assets") into the new public company. He also warned McLaughlin that, if the company's did not merge, Walker would be pulling his assets out of Coral because he needed them to inject into the new company. As a result, McLaughlin was inclined to merge Coral into DNA.

47. McLaughlin participated in the events hosted by Pierce and Walker at "DNA House" in Nashville, with Walker introducing him as part of the Pierce/Walker team even though the acquisition of Coral had yet to be formalized. Walker and Pierce had promised McLaughlin that he and Coral would benefit by falling under the DNA umbrella because the two of them would help McLaughlin raise capital for his funds. Nashville represented one of the first such opportunities – but, contrary to promises from Walker and Pierce, McLaughlin did not gain many new investors or investment capital from his participation.

48. Rather, in Nashville, Pierce and Walker both gave multiple presentations. They pitched investors on six DNA II funds, including the "Helix Opportunity Fund," which would be

"directly managed by legendary investors Brock Pierce and Scott Walker."[5] Pierce and Walker gave investors "a few specific examples of DNA Fund investments from 2017-2024." They touted a profit of approximately $14 million from Block.one (EOS) shares, $35 million from HBAR tokens, and $5.8 million from FXS tokens. Yet, despite these astronomical returns, investors in DNA (other than Pierce and Walker) lost money, receiving back only 70 cents for each dollar invested. Significantly, nowhere in the pitch deck do Pierce and Walker disclose that their previous DNA investors lost money.

49. Pierce and Walker also compared their company, DNA, to Galaxy Digital ("Galaxy"), one of the first digital asset treasuries, or "DATs." In their Nashville presentation, they noted, "DNA and GLXY both launched formally in 2017, the DNA team invested into the GLXY IPO in 2018- Our bankers were planning the IPO for DNA next. The 2018 market crash derailed our plans. GLXY got out, DNA did not."[6] In 2024, DATs like Galaxy were valued at up to 3.4 times net asset value. Walker and Pierce further told investors, "DNA is planning a reverse into a US Shell with an uplist to NYSE- Our raise is $3M on a $100M pre." In other words, Walker/Pierce/DNA already had $100 million in digital assets. They told investors that, if they could raise $3 million in cash, they would take the company public, and (presumably) receive the same bump in value as Galaxy, almost immediately tripling the value of the company. None of that ever happened.

50. The fraudulent statements made by Pierce and Walker in Nashville, before Nashville, and after Nashville were designed to induce investment into DNA as means of attracting unsuspecting investors to give them money to support their luxurious lifestyle, private jets, private

---

[5] *See* Exhibit 1, July 2024 Presentation at 13.
[6] *Id.* at 31.

yachts, five-star hotels, and worldwide parties paid for with investor money.

51.     Further, despite advertising six "funds,"[7] DNA had not actually created (and did not ever create) most of the "funds."  For instance, while the BTC & ETH Multiplier Fund and Moonshot Fund were concepts considered by DNA personnel, DNA never created actual funds implementing those two strategies.  And the High Yield Fund and Liquid Token Fund were McLaughlin funds siloed within DNA, meaning that an investor had to specifically invest in one of those funds to receive benefits.  Ultimately, persons investing in DNA as a whole did not receive exposure to, or benefit from, either fund.  And McLaughlin, even though he had given up ownership in his own entity, did not receive any benefit from investments into DNA.

52.     As a result, investor money solicited by Pierce and Walker for DNA could only be used for the Helix Fund and the Liongate AI Fund.  But neither fund was actually formally created, registered, or even managed in any formal way.  Rather, Helix Fund represented Walker's personal investments.  Sometimes Walker and Pierce would have DNA co-invest with Walker.  Sometimes Walker would invite other people to co-invest separate and apart from DNA.  Either way, Walker normally received better terms than any investor that invested through DNA (as detailed below). The relationship between Walker and Helix Fund provides further evidence of the alter ego relationship between DNA and Walker/Pierce.

53.     Meanwhile. the Liongate AI fund was supposed to focus on "early stage VC investments" in the AI space, but was instead used to enter into a long term contract with a public company (White Fiber: WYFI), a subsidiary of Bit Digital (NASDAQ: BTBT) where Pierce serves on the Board of Directors.  The White Fiber debacle is detailed below.

54.     As an additional part of their Nashville presentations, Pierce and Walker discussed

---

[7] *Id.* at 12.

DNA's "Investor Community: Management, Marketing and Awareness" operations including "in-person events." Specifically, Pierce and Walker told investors that they "specialize[d] in curating premier events worldwide, bringing together investors, Web 2 and Web 3 projects, as well as private and public companies." In other words, Pierce and Walker threw great parties around the world—but they neglected to mention that they wanted investors in DNA to pay for those parties.

### C.     Self Dealing ICO Transactions

55.     Walker and Pierce also said, "[b]eyond networking, we offer deep dives into emerging projects, ensuring that attendees are equipped with the latest insights and knowledge to navigate the evolving landscape of technology and finance." Those "deep dives into emerging projects" form the centerpiece of Pierce and Walker's current scheme to enrich themselves at the expense of their investors, contractors, and employees.

56.     Specifically, given Pierce and Walker's reputation in the Crypto industry, many ICOs believed it was advantageous to have Walker and Pierce's names associated with their new tokens. But Pierce and Walker did not select tokens in which to invest based on the underlying operational fundamentals of the companies promoting the tokens, rather they chose investments based on the kickbacks offered by the ICOs. Presumably through the mythical Helix Fund, Pierce and Walker would "invest" money received from their DNA investors into the ICOs in exchange for equity and ICO tokens subject to transfer restrictions. But DNA investors were never told how much exposure they had to the Helix Fund or any deal contained within it. DNA would often promise to invest in other companies through Helix Fund, even signing subscription documents, but Walker would fail to either contribute the required capital or raise it from other people.

57.     In exchange for the "investment" from DNA, the ICOs would promise to "sponsor" DNA House events – essentially, sending them investment dollars in the form of their own self-

branded Crypto meme coins or tokens that DNA could sell to defray the costs of the lavish parties at DNA House and private jet travel and private yacht rentals for Pierce and Waler (and their friends/romantic partners). Rather than pay for such travel, Walker and Pierce had DNA foot the bill. Additionally, on information and belief, Pierce and/or Walker would receive a kickback in the form of cash and/or advisory tokens for themselves, often at better terms than those provided to DNA and its investors. Specifically, on information and belief, Pierce and/or Walker's tokens would often vest earlier than DNA's, allowing Pierce and/or Walker to liquidate their tokens for cash ahead of DNA. Meanwhile, Walker and Pierce would use DNA as a platform to promote the token and then, as soon as the DNA tokens/coins "vested," Walker/Pierce/DNA would sell the tokens (while still promoting them). As in any "pump and dump" scheme, the token price would typically drop, leaving the investors solicited by Walker/Pierce/DNA at a severe economic disadvantage in comparison to Walker/Pierce/DNA. And, on information and belief, sometimes leaving DNA and its investors at a disadvantage compared to Walker and Pierce.

58. For instance, DNA signed an advisory agreement with EstateX whereby EstateX gave DNA 2.5% of all of its tokens, which vested over time. Then DNA began promoting EstateX. Once the first tranche of DNA tokens vested, DNA sold them for $167,000 while continuing to encourage investors to purchase EstateX tokens. Between when DNA sold and today, EstateX tokens lost 96% of their value. Meanwhile, EstateX also had an advisory agreement with Pierce through another one of his entities and, on information and belief, Pierce also sold his EstateX tokens while DNA was promoting EstateX and encouraging investors to purchase the EstateX tokens.

59. Walker also solicited investments in a company called Bitcoin OS. DNA invested $1.75 million and Walker solicited money from other investors, including Tim Flaherty, to invest

apart from DNA. Flaherty gave Walker $100,000 to invest. But rather than investing it in Flaherty's name, Walker invested Flaherty's money, along with Walker's own and possibly money from other investors, in his own name: a total of $1 million. Walker promised that he would transfer tokens and/or cash to Flaherty as soon as it was released by the company. Flaherty received his first allocation in January, one of 12 scheduled releases, but has not received tokens or cash over past two months. Additionally, on information and belief, Walker received a personal advisory agreement granting him advisory tokens that became liquid well before the tokens available to DNA and the individual investors, which were not saleable until 2026.

60. On information and belief, Walker and Pierce also falsely pumped up a company called Chintai by claimed to have made a $150,000 investment in Chinai. As an SAS platform company, Chinai's public valuation was based on a multiple of its annual revenue and, on information and belief, $150,000 represented a substantial portion of Chintai's revenue. Chinai's stock price spiked to 68 cents per share when its partnership with DNA was announced in early December 2024. But Walker and Pierce never planned from DNA to actually pay Chinai anything, let alone $150,000. Instead, Chinai was simply providing services to Walker/Pierce/DNA for free in exchange for DNA's promotion of Chintai. Once investors figured it out, Chintai's price plummeted and now sits around 2 cents per share.

**D. The Pump and Dump Scheme and "Deal Desk"**

61. Buried in their DNA website, Pierce and Walker admit to their unconscionable behavior and attempt to "disclaim" it. First, they say they are "paid advertisers, also known as stock touts or stock promoters, who disseminate favorable information (the 'Information') about publicly traded companies." The concept sounds reasonable. But then Pierce and Walker go on to say that they receive the Information from the promoted company itself: "The Information is

provided to us by the Profiled Issuers." And they "do not verify or confirm any portion of the Information. We do not conduct any due diligence, nor do we research any aspect of the Information including the completeness, accuracy, truthfulness or reliability of the Information." In other words, Pierce and Walker are willing to act as mouthpieces to pump up the price of a company's stock. Meanwhile, they admit that they will profit by acting contrary to their own recommendation to investors by "sell[ing] the shares [they] hold while we tell investors to purchase during the Campaign."

62. And, most shockingly, they explicitly admit to running "pump and dump" schemes: "A short time after we acquire a Profiled Issuer's securities, we may publish the (favorable) Information about the Profiled Issuer advising others, including you, to purchase; and while doing so, we may sell the Profiled Issuer's securities we acquired during our public dissemination of the Information causing us to profit while you suffer a loss." Further, "[w]hen we sell the shares of the Profiled Issuers that we hold, the price at which investors can sell their shares will dramatically decrease and will likely cause investors to suffer trading losses." Finally. "[i]f an investor relies on the Information [provided by Walker and Pierce] in making an investment decision it is highly probable that the investor will lose most, if not all, of his or her investment."

63. Walker and Pierce cannot cover the illegality of pump and dump schemes by disclaiming liability for such unconscionable actions. Walker and Pierce committed an act of wire fraud every time they utilized DNA to make a social media post about an ICA or a token and the personally profited by selling those tokens as part of each "pump and dump."

64. While in Nashville, Walker and Pierce also encouraged potential investors to check out DNA's website, which contains additional examples of wire fraud. For instance, the website tells investors they can "[i]nvest alongside DNA founders in the Helix Fund—early access to the

next wave of top-tier crypto and web3 opportunities"; with pictures of Pierce and Walker and a list of some of their investments, headlined by Tether, the "world's largest Stablecoin with over $140B in USD." The website also notes that "[t]he team initial investment in Tether (under $100K) is now worth up to $300,000,000 (over 3,000X)." That $300 million investment is among the Assets (defined below) that Pierce contributed to DNA.

65. On the website, Walker and Pierce announced the Walker would be personally managing the fund: "the first ever Helix Fund managed by Scott Walker." DNA solicited investors with the statement, "[i]n 2025 for the first time Brock and Scott are opening up a fund and allowing outside investors to come in and invest alongside these two legends." Of course, that statement was not true as Brock and Scott had already raised outside money both years earlier and again in 2024.

66. In December 2024, DNA announced the creation of its "Deal Desk" to promote "a carefully selected lineup of top web3, AI, and crypto projects." Deal Desk was supposed "to offer accredited investors and qualified purchasers flexibility in managing and accessing tokenized assets." And Pierce and Walker promised that DNA would "carefully vet[] all projects featured on DNA Deal Desk before projects are tokenized." Of course, this promise is in direct opposition to the disclaimer on their website where they say, "[w]e do not conduct any due diligence, nor do we research any aspect of the Information including the completeness, accuracy, truthfulness or reliability of the Information."

67. In fact, Walker and Pierce did virtually no due diligence on the companies before agreeing to promote the companies. DNA would sign an advisory agreement with a company. DNA would create an SPV through which investors could get exposure to a particular token by investing through the DNA Deal Desk. DNA kept 2% of any investment as a management fee.

Then Walker/Pierce/DNA would solicit investors from their mailing list(s) to invest in the SPV through Deal Desk. Once the company's tokens went live, DNA would sell them (while continuing to promote the tokens to other investors), generating a return for their SPV investors, with DNA keeping 20% of the profit. Of course, the tokens had virtually no value after the period of "pump and dump" promotion ended. Deal Desk provided a formal means for Walker/Pierce/DNA to "pump and dump" meme coins/tokens.

### E. Defrauding McLaughlin

68. Based on Walker and Pierce's false representations, including but not limited to their representation that the Tether Rights (defined below) would be contributed to DNA, McLaughlin agreed to merge Coral into DNA and the transaction was finalized in October 2024. When the deal closed, DNA required cash for legal fees, technology, and salary obligations, and used money from Coral's GP to cover such expenses, without disclosing that need to Coral in advance. Coral contributed $1.3 million in cash along with all of its assets under management. McLaughlin had no idea that DNA had virtually no cash on hand as Walker and Pierce misrepresented DNA's financial conditions in negotiations with him (while promising that they would be contributing $100 million in Assets). As a result, almost immediately, Walker and Pierce used Coral's money to pay DNA expenses, along with their own luxury travel expenses which were embedded within DNA. DNA owed the Coral GP holders approximately $350,000 and took nearly six months to make payment, harming McLaughlin's reputation. Walker and Pierce also prevented DNA from paying $470,236 in 2024 performance bonuses due to McLaughlin and other former Coral employees, further harming McLaughlin's reputation.

69. In an effort to prioritize investors, McLaughlin and his team took no shares in DNA and took no cash, instead allowing Coral GP investors to receive the full economic benefit of the

combination, including a 2.88% ownership interest in DNA. To induce McLaughlin to give up his company to Walker and Pierce without any immediate economic benefit, Walker and Pierce had a handshake agreement to give McLaughlin shares in DNA as part of a plan to contribute over $100 million of their own Assets into the company and take it public. But, as set forth below, Walker and Pierce reneged on their commitment. Additionally, rather than helping McLaughlin raise capital for the funds he had placed within DNA, Walker and Pierce focused on extracting advisory terms and tokens from ICA projects and leveraging the former Coral's team and operations in service of their own broader fundraising and business objectives. McLaughlin quickly realized that Walker and Pierce had misled him about the financial stability of DNA and that it had burned through most of the cash raised from investors for lavish parties and luxury travel, but remained hopeful that everything would turn out ok once Pierce and Walker contributed the promised $100 million in Assets and DNA became a public company.

**F.      Hiring a Professional Leadership Team**

70.      Of course, all of Walker and Pierce's problems would be solved if they could just take DNA public as a "digital asset repository" or "DAT" and convince the public to value the company at a multiple of its assets on hand. Walker and Pierce routinely touted the success of Galaxy Digital ("Galaxy"), one of the first DATs.

71.      In an investor presentation dated February 2025, Walker and Pierce continued to discuss their plan to contribute more than $100 million in personal assets to take DNA public:

# DNA IPO/RTO

DNA to reverse merger into a NASDAQ public company. Along with this, the principals are depositing $100M in personal assets to seed the new public entity

**Assets to contribute into Pubco include:**



**$100M**
DNA Holdings Venture, Inc



**$33M**
Bitcoin & liquid tokens



**$33M**
Blockchain Capital (Tether, Kraken, and other assets)



**$33M**
Various public and private investments marked at or below most recent valuations

That plan specifically included an indirect interest in Tether held through a Blockchain Capital Fund:



# BLOCKCHAIN.CAPITAL II: ASSETS

Blockchain Capital Fund II is one of the most successful funds of all time. With slightly over $10M in AUM the DNA Partners hit one of the most amazing grand slam home runs of all time: Once public DNA will be the only option for public company investors to get exposure to many of the most successful and valuable companies in the world including:

**Tether** · **XRP Ripple Labs** · **Coinbase** · **Kraken**

**Wave Holdings** · **Circle** · **Many Other Unicorns**

We believe the current assets held by DNA is marked well below market with a lot of room to grow

**BLOCKCHAIN CAPITAL**

Company confidential; DNA Holdings Venture inc February 2025

72. Recognizing their need for a lawyer with a strong Crypto background as they sought to take DNA public, Walker and Pierce met with Miglio at DNA House during the 2025 Bitcoin conference in Las Vegas on May 27, 2025. They told Miglio DNA needed a lawyer because they were taking DNA public, and would provide Miglio salary plus equity that would be worth

millions of dollars, perhaps tens of millions. They also directly stated that joining DNA and helping DNA achieve its goals would help Miglio's own personal project, DEIN, a crypto project that created a decentralized marketplace for insurance and risk. As discussed above, Pierce already had an unfulfilled investment obligation to DEIN. Pierce and Walker promised to help Miglio raise capital for DEIN and generally assist in its success as a DNA portfolio company. These promises were never fulfilled.

73. Shortly after Miglio joined, DNA brought on Shawn Matthews as the new CEO of DNA in July. Matthews is a highly respected financial-services executive who served as CEO and President of Cantor Fitzgerald & Co. from 2009 to 2018. As with Miglio, Pierce and Walker induced Matthews to join, in part, by repeating their promise to contribute $100 million or more of Assets into the company without diluting him or the company. Matthews brought James Nash, a highly qualified finance executive that became DNA's CFO. Walker and Pierce told Nash that DNA had large equity capital behind it through Pierce and Walker.

74. During the Summer of 2025, DNA also negotiated to acquire a company called BitAgent in exchange for approximately $10 million in cash and ownership in DNA. Then, on a call with Miglio on the expected closing date, Walker told BitAgent personnel that they had to take a lower percentage of ownership in DNA because he and Pierce were on the verge of contributing hundreds of millions of dollars of assets into DNA and taking it public, making DNA much more valuable. Based on that representation, BitAgent closed the deal with DNA at on the new terms proposed by Walker.

75. Together with other members of the DNA team, Matthews, Nash, and Miglio undertook extensive efforts to plan and execute DNA's path to becoming a public company at the request of Pierce and Walker. The strategy involved identifying a publicly traded company with

p. 28

limited assets and operations – a "Shell."  DNA would then merge into the Shell, contributing all of its assets and taking over the company.  At the time, DNA had limited assets as Pierce and Walker had yet to contribute their promised $100 million in Assets and, without those Assets, no merger would be possible as DNA had virtually no other assets other than those contributed by Coral (and worthless meme coins/tokens).

76.     Matthews and others identified prospective Shell vehicles and led diligence efforts on those targets, Nash began the process of preparing the Company for audit and audited financial reporting, and Miglio reviewed, drafted, and advised on hundreds of contracts that governed DNA's legal obligations and commercial relationships, while attending hundreds of calls and meetings. The $100 million in Assets Pierce and Walker promised to inject into DNA also came up in every negotiation with shell company prospects as the Assets had to be contributed before DNA could go public.

77.     In August 2025, prior to hiring Nash as CFO, DNA hired a consulting company called Flexible Consulting to assist with accounting work and Flexible Consulting continued to provide line level accountants to assist Nash in the Fall of 2025.  Nash and Flexible Consulting quickly determined that, contrary to the representations of Pierce and Walker, DNA was not adequately capitalized apart from the promised Assets, with at least two accountants resigning along the way.  Specifically, Walker and Pierce originally capitalized the company with millions of dollars of their stock holdings in a publicly traded company called SRAX, Inc., with the plan to merge DNA into SRAX.  But by October 2025, SRAX was literally a penny stock, trading between a high around 1 cent per share down to a November 2025 low of 1/10 of 1 cent per share.  In other words, the supposed millions of dollars in equity contributions from Pierce and Walker were completely worthless.  Even so, Pierce and Walker owned over 80% of DNA, while the investors

who contributed millions of dollars, McLaughlin, who contributed a profitable entity, and DNA employees who contributed their sweat equity, owned very little. Even worse, Flaherty and other DNA investors had no idea that Pierce and Walker had not capitalized DNA with cash.

78. Nash also determined that DNA's "advisory" and "events" services were losing millions of dollars a year because DNA had been booking revenue in the form of meme Crypto coins received from the Crypto companies Walker and Pierce agreed to "promote," not actual cash. On information and belief, of the approximately 36 agreements that DNA entered into to promote Crytpo companies, very few resulted in a successful company or profitable outcome and those companies Crypto coins had little to no value – even though DNA had booked substantial revenue based on "payment" in meme Crypto coins.

79. In fact, as of the Summer and Fall of 2025, only McLaughlin's business unit (that he brought from Coral) was generating positive income for DNA. DNA had little to no cash on hand, other than cash contributions provided by Walker and a loan agreement with a usurious interest rate of 40%-60% annually.

### G. Long Overdue Contribution of Assets

80. DNA simultaneously courted multiple public shell companies including, but not limited to EVTV, VIVS, and SONM. The identify of the particular shell company was irrelevant to the corporate strategy – all that mattered was that the shell was already publicly listed as DNA would be contributing more than $100 million in Assets for the new public company.

81. In August, when DNA was deep into negotiations with VIVS as its top choice of public companies to merge with, it was evident that the asset transfer was a material part of the merger. In an email dated August 4th, 2025, subject line "DNA / VIVS Transfer Assets", the firm representing VIVS asked the DNA Team in a group email for the "schedule of assets that will be

p. 30

deposited". To which Scott Walker replied "[w]orking on final as we speak.. Give me one or two days and we will have it for you.." and Walker was "deep into the asset list for you".

82.    On September 22, 2025, Pierce and Walker entered into an agreement (the "Written Consent") whereby they promised all other DNA shareholders that they would "contribute significant personal assets to [DNA] to assist it in its goals" in exchange for shares of preferred stock to "facilitate growth and potentially engage a merger that would lead to public market transactions."

83.    Then, on September 28, 2025, Pierce and Walker entered into an agreement with DNA ("Agreement for the Contribution of Additional Capital Assets") whereby they formally agreed to transfer the Assets to DNA. The Assets, as listed in the for the Contribution of Additional Capital Assets included, but were not limited to, 199 coins of bitcoin, 9.32% of BCAP Fund I LP, a 27.5% distribution interest of BCAP Fund II GP, a 1.02% interest in BCAP Fund II LP, 237,637 shares of BCAP Fund III LP." Most significantly, the BCAP Fund II GP interest included the profit interest tied to, on information and belief, 5% of the shares in Tether (the "Tether Rights"), which Pierce and Walker describe on their website as worth "$300 million." The Agreement for the Contribution of Additional Capital Assets explicitly put in writing the promises Walker and Pierce has been making for nearly a year: DNA "requires additional assets to facilitate a potential merger transaction with a NASDAQ-listed company which is the subject of current negotiations." As noted above, DNA's entire team had been focused on negotiating such a merger for months, with Matthews identifying various possible Shells. Unbeknownst to investors, Walker and Pierce also added a clause permitting them to take the Assets back if the NASDAQ merger was "not consummated by March 27, 2026.

84.    Pierce and Walker sent the Written Consent to Flaherty and potentially other

investors, but failed to send the Agreement for the Contribution of Additional Capital Assets.  In doing so, they intentionally concealed the possibility that they could take the Assets back from DNA as such an act would have been inconsistent with their promises to Flaherty, Miglio, McLaughlin, and many others.  As a result, each mailing constituted an act of mail fraud.

85.     The Agreement for the Contribution of Additional Capital Assets did not actually cause the contribution of Assets to occur.  Rather, each of Walker and Pierce had to take additional steps to formally contribute the Assets to DNA.  Rather than contribute his Assets directly, Pierce transferred several of the Assets, including, the Tether Rights from one entity he owned, Percival Services, LLC to another entity that may have been formed for that specific purpose: RNA LLC.  Then Pierce contributed the ownership interest of RNA LLC to DNA.

**H.     White Fiber, POAI, and AGPU: the ATH Fraud**

86.     As set forth above, Walker and Pierce had DNA enter into a long term contract with a company called White Fiber.  Rather than mining Crypto tokens, White Fiber mines new "AI tokens" known as "Aethir" or "ATH."  Walker and Pierce committed DNA (and DNA investor money) to a multi-year contract whereby DNA would pay White Fiber to mine Aethir for DNA.  Unfortunately, because the price of Aethir has not risen as they expected, Walker and Pierce are paying White Fiber millions of dollars more to mine each Aethir token than it is worth – guaranteeing a large recurring monthly loss for DNA.   Despite the obvious conflicts of interest since Pierce is on the Board of Directors of White Fiber's parent company, it appears Walker and Pierce took no steps to protect their investors from losses at the expense of Pierce's company.  Rather, they doubled down.

87.     Specifically, Walker and Pierce entered into a partnership with a company called Predictive Oncology Inc.  (NASDAQ: "POAI").  On September 29, 2025, POAI and DNA

announced that POAI had supposedly raised $343.5 million through private placements to accumulate ATH, setting itself up as a digital asset treasury for ATH. But only $50.8 million of that capital raise came in cash, with $173.3 million of "in-kind contributions of locked and unlocked ATH," which the company valued at just over $0.59 per ATH, for a total of $292.7 million. DNA is listed as "the strategic adviser and an investor" in the cash portion of the private placement. But the announcement appears misleading as DNA did not have even a fraction of $50 million available to make such an investment, investing only $5 million, which, on information and belief, was contributed by Walker to DNA for that purpose. Regardless, DNA ended up with 7.5% equity ownership of POAI. DNA also received an agreement to manage the assets in POAI in exchange for a recurring fee. And the $50 million in cash was supposed to be used to buy ATH on the open market, propping up the price of ATH.

88. Essentially, POAI became a publicly traded proxy for the value of ATH tokens. Of course, but for the public vehicle holding the "locked" ATH – including DNA's locked ATH – the token was essentially illiquid. When word of the deal leaked, the value of ATH doubled from $0.03 per ATH token to the anticipated deal price – approximately $.06 – in mid-September. Further trading volume increased 8x, from ATH volume of approximately $20,000 per day in August 2024, to average volume of over $160,000 per day between September 9, 2024 ($318K) and September 28, 2024, the day before the official announcement of DNA's involvement.

89. DNA had accumulated 27,796,757.80 ATH tokens as of September 7, 2025. Then, with material non-public information concerning the impending transaction, DNA began to sell large volumes, selling more than 937,000 ATH token on September 8, 2026 and another 2,500,000 ATH tokens on September 12, 2026. DNA continued selling after the official announcement on September 29, 2025, selling two million ATH tokens on October 2, 2025 for over $100,000—a

price of $0.05 per token—nearly 60% higher than the market price before news of the DNA sponsored POAI deal.  Two weeks later, the price of ATH had fallen below $0.03 per token and it continued to decline to $0.016 in November 2025.

90.    Walker and Pierce put DNA and its employees in the middle of the mess by appointing Shawn Matthews to the POAI Board of Directors and appointing McLaughlin as its Chief Investment Officer on October 14, 2025.

91.    As of Nov. 10, 2025, POAI reported $44.5 million in cash and only $145.9 million of ATH tokens, for total assets of approximately $190 million – dramatically less than the supposed $343.5 million investment POAI touted a month earlier.  At the same time, POAI announced that it had used $25 million of the $44.5 million in cash to buy 927.9 ATH tokens at a price of $0.027 per token, temporarily propping up the price of ATH. But less than two weeks later, on November 21, 2025, POAI reported that its 5.6 billion ATH tokens had decreased in value to only $90 million, or $0.016 per token.

92.    POAI entered into a reverse merger with Axe Compute, Inc. in October 2025 and changed its NASDAQ ticker to AGPU in December 2025.  AGPU exists, at least from Walker and Pierce's perspective, to prop up the value of ATH to allow Walker and Pierce to sell the millions of tokens they accumulated in DNA through their contract with White Fiber.  DNA transferred its AGPU shares into a brokerage account at the direction of Walker and/or Pierce and/or DNA's President, Chris Miglino.  DNA's CFO, Nash, told them that DNA could not sell those shares given its activities in promoting the AGPU stock and its insider status.

93.    On January 12, 2026, DNA announced AGPU as a sponsor of its January 2026 investor summit in Puerto Rico.  Then, on January 15, 2026, Walker and Pierce allowed DNA to publish supposed "in-depth research on Axe Compute" attempting to pay it back for the

p. 34

sponsorship and prop up AGPU's share price. AGPU "surged 17.11% intraday" to $9.00 per share on the release of DNA's report and trading volume . But the increase was short-lived as AGPU gave back all of its gains the following day and closed at $6.43. On information and belief, DNA's report contained inaccurate and misleading data concerning AGPU and its release constituted an act of wire fraud. Mysteriously, it appears DNA's report is no longer available online.

94. Matthews resigned as a Director of AGPU the same day as the DNA "report," with McLaughlin resigning as Chief Investment Officer of AGPU two business days later. Then Nash resigned as CFO of DNA on Tuesday, January 20, 2026. As of March 6, 2026, AGPU's stock is down even further to $1.83. And ATH tokens are down to $0.006, meaning that the value of POAI's ATH is now only $33.6 million. Meanwhile, DNA finally terminated its White Fiber contract, but still owes it millions of dollars.

### I. The Plan to Recover the Tether Rights

95. Soon after he contributed the Tether Rights, Pierce began taking actions to try and reclaim them. Specifically, during the Fall of 2025, Tether announced a plan to raise $15-$20 billion at a $500 billion valuation. The $500 billion valuation represented an increase of approximately 16 times the valuation used for the Tether Rights on Pierce's balance sheet, bringing the value of Pierce's interest in the Tether Rights to, on information and belief, more than a billion dollars. As he only owned 44% of DNA, he quickly regretted contributing all of his Tether Rights to DNA as the potential increased value of the Tether Rights meant that Piere contributed substantially more Assets than Walker.

96. On December 16, 2025, two members of Pierce's team initiated a call with Matthews, Miglio, and outside counsel for DNA, William Hughes. Pierce's personnel stated a desire to withdraw all but $50 million of Pierce's contributed Assets from DNA. Eventually,

Walker and Pierce joined the call and Walker told Pierce that both he and DNA would sue Pierce if he attempted to withdraw any of the Assets. Likewise, Hughes stated that the various agreements precluded Pierce from removing any Assets from DNA at that time.

**J.      The Destruction of DNA as a Viable Business**

97.     Within the next day or two, it appears Walker and Pierce reached a mutually beneficial understanding at the expense of Flaherty, Miglio, McLaughlin, and many others. First, Walker and Pierce failed to take actions necessary to allow DNA to complete its audit, including, but not limited to supplying money to pay for accounting staff and auditors and giving Nash access to information to validate the Assets, causing Matthews and Nash to resign as CEO and CFO, respectively. Second, Walker and Pierce directed DNA to stop pursuing a NASDAQ merger for the entirety of DNA (as required under the Agreement for the Contribution of Additional Capital Assets). Instead, they began a plan to merge the part of DNA within McLaughlin's responsibility (the only profitably part of DNA) with Sonim ("SONM"), a NASDAQ entity. Such a merger would allow Walker and Pierce to withdraw their Assets and abandon the remainder of DNA (and all of its liabilities). Third, Walker fired Miglio. Fourth, Walker and Pierce laid off most of DNA's staff.

98.     The plan to tank DNA was evident in Walker and Pierce's decisions throughout December 2025 and January 2026. For instance, Jake Flaherty sourced three potential advisory deals where the Crypto companies would agree to pay cash up front plus tokens in exchange for DNA's help in marketing and growing their companies. Walker and Pierce rejected all of the deals. Additionally, on information and belief, two individuals expressed interest in investing at least $10 million in cash into DNA. Walker and Pierce immediately rejected both deals.

99.     Walker and Pierce completed their plan of merging *part* of DNA into a NASDAQ

company, placing DNA's digital asset trading platform into SONM in December 2025. Then, on January 27, 2026, Sonim announced it would be renamed "DNA X, Inc." But Pierce and Walker did not transfer any of the Assets from DNA to DNA X.

100. On January 26, 2026, Pierce and Walker directed Chris Miglino to lay off approximately 75% of DNA staff, including Jake Flaherty and Miglio. Then Pierce and Walker fired Miglino as well.

101. Then, on a Zoom call in early February 2026, Walker told remaining DNA employees that their shares in DNA were worthless, that he and Pierce were in process of selling or taking a loan against the Tether Rights, which would give DNA $25 million of cash to cover operational expenses, and that they were focused on DNA X.

102. On a phone call, Walker and Pierce also told Flaherty that DNA had approximately $25 million liabilities and a much lower amount of assets after the transfer of assets to SONM and the formation of DNA X. In other words, DNA will be immediately insolvent on removal of the Assets.

103. On February 12, 2026, Derivative Plaintiff Flaherty sent a litigation hold letter to Walker and Pierce and demanded redemption of his shares in DNA. Walker and Pierce declined the demand.

104. DNA's counsel stated that the Assets remained within DNA and that DNA has not encumbered the Assets, but was unable to make any representations as to whether Pierce had individually taken any actions to encumber any Asset. Pierce did not respond in writing to Plaintiffs' request for such a confirmation. Most troubling, the attorney stated that, from Walker and Pierce believed they could take the assets back from DNA at any time: "Under our interpretation of this Agreement, there is currently no impediment to such a transfer."

105.     Yesterday, on March 25, 2026, Walker and Pierce hosted a DNA stockholders meeting via Zoom to pitch a new "recapitalization" of DNA after they remove the Assets.  Walker and Pierce promised to refund investors initial investments – but only if stockholders voted to approve a "recapitalization" whereby Walker and Pierce promised to infuse $50 million in cash or "cash like" assets to DNA in exchange for preferred equity.  But the "recapitalization" appears to be a shell game allowing Walker and Pierce to remove the majority of the Assets while covering their breach of fiduciary duty with a sham shareholder vote (required within 24 hours), even though they controlled approximately 90% of voting shares.  If Walker and Pierce truly desire to repay their investors, they could simply offer to individually purchase each investor's stock without requiring any stockholder vote.

106.     On the call, Walker claimed he had at least $13 million in "loans" outstanding to DNA.  Those "loans" are either: (1) inappropriate usurious loans; or (2) undocumented capital contributions.  The Assets include 199 bitcoins from Walker, with a current market value of over $14 million.  So Walker will be able to remove all of his Assets other than a portion of his bitcoin contribution from DNA.  Meanwhile, Pierce said he will put in $25 million in cash, but, on information and belief, he either: (1) has such cash on hand because he inappropriately encumbered his portion of the Assets (likely involving the Blockchain Capital/Tether interests); or (2) he does not have the cash, but plans to raise it by pulling his Assets from DNA and encumbering all or a portion of them in exchange for $25 million.  Either way, DNA shareholders end up much worse off than they are today with all Assets held by DNA.

107.     In the meeting on March 25, 2026, a stockholder asked: "What is the current value of the market value of the company's indirectly held Tether interest?" Walker responded: "We have no idea because the company doesn't have any indirectly held Tether interest.  The company

has interests – for another 24-48 hours – of Blockchain Capital position.  But that is all being rescinded."  In other words, Walker knows that DNA *does* have a current indirect interest in Tether (through Blockchain Capital), but Walker is not going to tell investors how much it is worth (at least $300 million according to DNA's website) because he and Pierce are removing it on March 27.

108.    Walker also confirmed that removing the Assets would leave DNA insolvent: "The Company in 48 hours has zero assets.  The company currently has some assets that were contributed that are being removed.  So all of those assets are being rescinded pursuant to the original agreement to put the assets in.  So there was about $100 million of assets going in that are now going out."   Walker also pointed out that DNA's liabilities far exceed its remaining assets: "DNA has a couple hundred thousand in cash.  About $18 million in debt."

109.    Walker and Pierce admitted that DNA will be insolvent once they remove the Assets and are asking DNA stockholders to approve a "recapitalization" under which they will put some of the Assets and/or cash derived from the Assets back into DNA.  Walker and Pierce could make such a capital contribution now – they own 80-90% of DNA.  But they are choosing not to do so, insisting on a shareholder vote giving them additional equity in exchange for the recontribution of just a portion of the Assets back to DNA.  But the stockholder vote will not be complete until after Walker and Pierce remove the Assets on Friday.  And, of course, as Walker and Pierce have a controlling interest in DNA, they can decide how the stockholder vote will turn out.

### DEMAND FUTILITY ALLEGATIONS

110.    Derivative Plaintiffs bring this action after making a reasonable and good faith assessment of whether a pre-suit demand on DNA's controlling members would be futile. Demand is excused as futile because Walker and Pierce, who exercise complete and exclusive control over

DNA. They are the sole members of DNA's Board of Directors and its majority shareholders. They are also the very persons against whom the derivative claims are asserted and they face a substantial likelihood of personal liability on each claim herein. Walker and Pierce have already demonstrated their unwillingness to pursue these claims by actively participating in and directing the wrongful conduct at issue, retaining the benefits thereof. Any demand upon Walker and Pierce to cause DNA to bring these claims against themselves would be a futile act.

111.  Walker and Pierce are the sole managers and controlling persons of DNA. No independent governance body or disinterested majority exists within DNA capable of impartially evaluating a demand to bring the claims asserted herein. Accordingly, demand on DNA is excused in its entirety as futile.

## CAUSES OF ACTION

### COUNT 1: Derivative Claim for Violations of RICO: 18 U.S.C. § 1962(c)
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

112.  Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

113.  The RICO Enterprise consists of Pierce and Walker associated in fact for the purpose of defrauding DNA, its investors, employees, and contractors through the instrumentality of DNA and otherwise. Pierce and Walker exercised complete domination and control over DNA's affairs, finances, and operations at all relevant times, and used the RICO Enterprise to enrich themselves at DNA's direct expense. Contrary to other cases where RICO actors use an entity in their RICO scheme by causing the entity to make money inappropriately, Pierce and Walker used DNA as an instrumentality of their scheme to defraud others and drained money from it, directly damaging DNA.

114.     As set forth above, pursuant to and in furtherance of their fraudulent scheme, Pierce and Walker agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity including: (a) fraud in the sale of securities in connection with selling ownership interests in DNA and selling crypto tokens while simultaneously directing DNA to tell investors to purchase such tokens; (b) wire fraud through fraudulent posts, emails, text messages, and WhatsApp messages directed at DNA investors, employees, and counterparties; (c) wire fraud through the fraudulent DNA website disclaimers and Deal Desk promotions; (d) wire fraud through Pierce's false investment commitments on the Crypto Knights television program; (e) mail fraud in connection with the Written Consent sent to investors; (f) wire fraud through the fraudulent report on Axe Computing/AGPU; (g) illegal gambling in violation of 18 U.S.C. § 1955; and (h) operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960. These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

115.     While not all of the predicate acts caused direct damage to DNA, many of them did including, but not limited to: (a) mail fraud in connection with the Written Consent sent to investors and the omitted agreement allowing Pierce and Walker to take back their assets, stripping DNA of its most valuable asset; (b) wire fraud through the fraudulent report on Axe Computing/AGPU, exposing DNA to securities fraud liability;  (c) wire fraud through fraudulent posts, emails, text messages, and WhatsApp messages connected to the White Fiber transactions; (d) wire fraud through fraudulent posts, emails, text messages, and WhatsApp messages connected to any advisory agreements and/or token/coin sales where Pierce and/or Walker benefitted at the expense of DNA; (e) wire fraud through fraudulent posts, emails, text messages, and WhatsApp messages connected to their scheme to shut down DNA rather than taking it public, allowing them to

withdraw the Assets and leave DNA insolvent.

116. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b) and (c), DNA has been injured in its business and property. Specifically, DNA suffered harm including but not limited to: (a) loss of the full value of investor capital raised that was diverted to fund Pierce's and Walker's personal luxury expenses, travel, and parties rather than being invested for DNA's benefit; (b) losses from the White Fiber/ATH contract entered into for Pierce's personal benefit rather than DNA's; (c) loss of the Tether Rights and other contributed Assets that Pierce and Walker now seek to reclaim; (d) losses from pump-and-dump token transactions that generated no sustainable value for DNA; (e) destruction of DNA's going concern value, business relationships, and reputation; (f) the loss of the NASDAQ merger opportunity that was deliberately sabotaged by Pierce and Walker; and (g) costs and expenses incurred as a result of the fraudulent scheme. Any recovery on this Count shall be paid to DNA.

### COUNT 2: Derivative Claim for Breach of Fiduciary Duty
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

117. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

118. Walker and Pierce, as the controlling directors, officers, and owners of DNA, owed DNA fiduciary duties of loyalty, care, and good faith. These duties required Walker and Pierce to act in DNA's best interests, to refrain from self-dealing, to avoid transactions where their personal interests conflicted with DNA's interests, and to preserve and protect DNA's assets and going concern value.

119. Walker and Pierce breached their fiduciary duties to DNA in numerous respects

including: (a) using DNA's assets and investor capital to fund their personal luxury travel, private jets, private yachts, and lavish parties rather than for DNA's benefit; (b) entering into the White Fiber contract for Pierce's personal benefit despite the obvious conflict of interest arising from Pierce's board seat at White Fiber's parent company, causing DNA ongoing and substantial monthly losses; (c) structuring the Asset contribution agreement with a secret reverter clause allowing them to reclaim the Assets, without disclosing this to DNA's other stockholders; (d) receiving personal advisory tokens and kickbacks from ICO companies at better terms than those provided to DNA; (e) deliberately destroying DNA's business, including sabotaging the NASDAQ merger and the DNA public offering, to facilitate reclamation of the Assets; (f) allowing DNA to publish a fraudulent research report on AGPU while DNA was restricted from trading; (g) failing to permanently capitalize DNA with promised funds while retaining majority control; and (h) by attempting to remove the Assets from DNA after destroying the ability for it to go public. As a direct and proximate result of these breaches, DNA has suffered damages in an amount to be determined at trial. Any recovery on this Count shall be paid to DNA.

### COUNT 3: Derivative Claim for Breach of the Duty of Candor and Full Disclosure
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

120. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

121. As the sole controlling managers and majority owners of DNA, Walker and Pierce owed DNA and its minority shareholders a fiduciary duty of candor and full disclosure. This duty required Walker and Pierce to disclose all material information when seeking shareholder consent to corporate transactions, when making representations in connection with corporate actions, and whenever their personal interests diverged from those of DNA and its other shareholders. The duty

of candor operates independently of and in addition to the duties of loyalty and care — a controlling member breaches the duty of candor even in a transaction that is otherwise financially fair if it is accomplished through materially incomplete or misleading disclosure.

122. Walker and Pierce breached their duty of candor and full disclosure on multiple specific occasions, including but not limited to the following:

(a) Walker and Pierce deliberately transmitted only the Written Consent to DNA shareholders — which stated that they would "contribute significant personal assets" to DNA — while intentionally withholding the Agreement for the Contribution of Additional Capital Assets executed six days later on September 28, 2025, which contained the secret reverter clause permitting them to reclaim all Assets if the NASDAQ merger was not consummated by March 27, 2026. Pierce and Walker deliberately withheld the Agreement because, as the complaint alleges, disclosure of the reverter clause would have been inconsistent with their promises to DNA's shareholders. The decision to selectively transmit only the document that supported their representations while concealing the document that contradicted them is a paradigmatic breach of the duty of candor; and

(b) In soliciting investor capital for DNA — including Tim Flaherty's $750,000 investment — Walker and Pierce failed to disclose that DNA's prior investors had received only 70 cents for each dollar invested, a fact that was directly material to any prospective investor's assessment of Walker and Pierce's investment track record, which they held out as the primary basis for confidence in their management of DNA 2.0;

123. Each of the above disclosure failures was material — there is a substantial likelihood that disclosure of the omitted information would have been viewed by a reasonable

shareholder as significantly altering the total mix of information available. Each was made knowingly and in bad faith, as Pierce and Walker were fully aware of the omitted information at the time of each disclosure failure. As a direct and proximate result of these breaches of the duty of candor, DNA has suffered damages including the loss of informed shareholder oversight, the entry into transactions that would not have been approved with full disclosure, and the loss of value caused by the undisclosed conflicts and concealed reverter mechanism. Any recovery on this Count shall be paid to DNA.

### COUNT 4: Derivative Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

124. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

125. Every contract contains an implied covenant of good faith and fair dealing that requires each party to act honestly and in a manner consistent with the reasonable expectations of the other party, and prohibits any party from exercising contractual discretion in a way that deprives the other party of the material benefits of the contract. The implied covenant does not override express contractual terms but operates to govern how those terms are exercised — a party with discretion under a contract cannot exercise that discretion arbitrarily, dishonestly, or in a manner calculated to destroy the other party's rights under the agreement.

126. Pierce and Walker's: (1) creation of; and (2) intended invocation of the March 27, 2026 reverter clause is a paradigmatic violation of the implied covenant. Even if the reverter clause were facially valid — which Derivative Plaintiffs deny — its exercise under the circumstances present here would violate the implied covenant on each of the following independently sufficient

p. 45

grounds:

(a) Pierce and Walker deliberately prevented the occurrence of the condition — the NASDAQ merger — upon which the reverter is contingent. The reasonable expectation of DNA under the Contribution Agreement was that Pierce and Walker would support, not sabotage, the merger that was the stated purpose of the Asset contribution. Having deliberately engineered the non-occurrence of the condition they now seek to use as a basis for reclaiming the Assets, Pierce and Walker cannot in good faith invoke the reverter;

(b) Pierce and Walker exercised their discretion over DNA's management, hiring decisions, merger strategy, and business development — in ways calculated to ensure the reverter condition would not be satisfied, while simultaneously concealing from DNA's shareholders that the reverter existed. This coordinated exercise of managerial discretion to frustrate the contract's stated purpose while secretly preserving the right to exit violates the implied covenant's prohibition against acting to deprive the other party of the benefit of its bargain;

(c) The dramatic increase in the value of the Tether Rights — from a contribution-date valuation to a potential current value exceeding $1 billion — is the primary motivation for Pierce's attempt to reclaim the Assets. Pierce's December 2025 attempt to reclaim all but $50 million of his contribution came immediately after Tether announced a capital raise at a $500 billion valuation. Invoking a contractual exit mechanism opportunistically, solely because the contributed assets have dramatically appreciated in value, and in a manner that strips that appreciation from DNA and its shareholders, is precisely the kind of arbitrary, opportunistic exercise of contractual discretion that

the implied covenant prohibits; and

(d) DNA's reasonable expectation under the Written Consent — the expectation that induced DNA and its shareholders, employees, officers, and counterparties to take all of the reliance actions described herein — was that the Assets would remain in DNA and form the foundation of a NASDAQ-listed public company. Pierce and Walker's plan to withdraw the Assets on March 27 would completely and permanently defeat that reasonable expectation, leaving DNA insolvent. Exercising contractual discretion in a manner that wholly defeats the other party's reasonable expectations and leaves it with nothing of the benefit it bargained for violates the implied covenant as a matter of law.

As a direct and proximate result of Pierce and Walker's breach of the implied covenant, DNA has suffered and will continue to suffer damages including the loss of the Assets, the destruction of its going concern value, and the loss of the full benefit of the Written Consent. DNA is entitled to compensatory damages, specific performance preventing exercise of the reverter, and all other relief available for breach of the implied covenant. Any monetary recovery on this Count shall be paid to DNA.

### COUNT 5: Claim for Declaratory Judgment — Invalidity and Unenforceability of the March 27, 2026 Reverter Clause (By All Derivative Plaintiffs on Behalf of DNA and Individually Against All Defendants)

127. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, both derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1 and individually by each Derivative Plaintiff in their capacity as a shareholder of DNA.

p. 47

128. An actual and justiciable controversy exists between the parties concerning the validity, enforceability, and legal effect of the reverter clause contained in the Agreement for the Contribution of Additional Capital Assets dated September 28, 2025 (the "Contribution Agreement"), which purports to permit Pierce and Walker to withdraw the Assets from DNA if a NASDAQ merger "is not consummated by March 27, 2026." Pierce and Walker have asserted, through their counsel, that "under our interpretation of this Agreement, there is currently no impediment to such a transfer," and have indicated their intent to exercise the reverter on or around March 27, 2026. Plaintiffs contend that the reverter clause is void, invalid, and unenforceable on multiple independent grounds.

129. First, the reverter clause is void and unenforceable as the product of fraud in the inducement. Pierce and Walker induced DNA's shareholders to accept the Written Consent — which promised an unconditional contribution of significant personal assets — while simultaneously executing the Contribution Agreement containing the reverter clause and deliberately concealing it from those same shareholders. A contractual provision procured through fraudulent concealment of its existence from the party whose rights it eliminates cannot be enforced against that party.

130. Second, the reverter clause is void as against public policy. Pierce and Walker inserted it into the Contribution Agreement after inducing DNA's shareholders, employees, officers, and counterparties to take substantial and irreversible actions in reliance on the Asset contribution — including McLaughlin contributing Coral, Flaherty contributing $750,000, Matthews and Nash leaving prestigious positions, and DNA entering into merger negotiations with VIVS and other shell companies. Permitting Pierce and Walker to invoke the reverter clause after extracting the full benefit of those reliance actions — while having sabotaged the very NASDAQ

merger the reverter was contingent upon — would be contrary to the fundamental public policy against allowing a party to benefit from its own wrong.

131. Third, the reverter clause is unenforceable under the doctrine of unclean hands. Pierce and Walker cannot invoke a contractual right that was triggered by the non-occurrence of a condition — the NASDAQ merger — that they themselves deliberately prevented. The merger did not occur because Pierce and Walker sabotaged it: they failed to supply the financial documentation Nash required to validate the Assets, directed DNA to abandon the merger strategy, stripped DNA's only profitable division into SONM to form DNA X, and laid off the professional team assembled to execute the merger. A party may not invoke a contractual condition precedent that it has itself prevented from occurring.

132. Fourth, the reverter clause constitutes a breach of the fiduciary duty of loyalty. Controlling managers of a company cannot insert a self-dealing mechanism into a corporate agreement — one that allows them to reclaim assets they have contributed in exchange for corporate ownership and consideration — without full disclosure to and approval of the disinterested shareholders. The reverter clause was a classic self-dealing transaction that, having never been disclosed to or approved by DNA's disinterested shareholders, is subject to entire fairness review and cannot be sustained under that standard.

133. Derivative Plaintiffs therefore seek a declaration pursuant to 28 U.S.C. § 2201 that: (a) the reverter clause in the Contribution Agreement is void, invalid, and unenforceable on each of the grounds stated above; (b) Pierce and Walker have no right to withdraw, transfer, encumber, or otherwise remove the Assets from DNA by operation of the reverter clause or otherwise; (c) the Assets are the property of DNA and shall remain so until further order of this Court; and (d) any purported exercise of the reverter clause by Pierce or Walker, or any transfer of the Assets

effectuated pursuant thereto, is void ab initio and without legal effect.

## COUNT 6: Derivative Claim for Permanent Injunctive Relief
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

134.    Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1 and the equitable powers of this Court.

135.    Derivative Plaintiffs have succeeded on the merits of the claims set forth in Counts 1 through 4 above, or in the alternative are substantially likely to succeed on those merits. Each count independently establishes that Pierce and Walker have engaged in a sustained, multi-year course of fraudulent, self-dealing, and fiduciary-breaching conduct that has caused and continues to cause irreparable harm to DNA.

136.    DNA faces irreparable harm that cannot be adequately compensated by money damages alone. The Assets — including, most significantly, the Tether Rights representing a profit interest tied to on information and belief 5% of Tether shares, which Pierce and Walker describe as worth $300 million and which may be worth in excess of $1 billion at Tether's current reported $500 billion valuation — are unique, illiquid, and not readily replaceable. Once transferred or encumbered, the Tether Rights and the associated blockchain capital fund interests cannot be recovered through a subsequent money judgment because: (a) Pierce has demonstrated the ability and willingness to structure asset transfers through layered entities (as evidenced by the Percival Services to RNA LLC to DNA transfer) in ways that obstruct recovery; (b) the value of the Tether Rights is tied to Tether's capital raise and secondary market activity that may not be replicable at any future point in time; (c) the March 27, 2026 contractual reverter date creates an imminent and specific deadline after which Pierce and Walker contend they are entitled to withdraw the Assets unilaterally; and (d) DNA has already been reduced to a shell with liabilities well in excess of

assets (if the Assets are removed).  Further, Walker and Pierce recently told shareholders that, upon removal of the Assets, DNA will have less than $250,000 cash on hand, no other substantial assets, and liabilities exceeding $18 million—it will be insolvent.  As a result, absent an order maintaining the Assets within DNA, DNA will be forced into bankruptcy.

137.    The balance of hardships strongly favors DNA. Preventing Pierce and Walker from withdrawing the Assets preserves the status quo and does not deprive them of any asset to which they are legitimately entitled pending adjudication of the merits — the Assets were formally contributed to DNA pursuant to the Agreement for the Contribution of Additional Capital Assets executed September 28, 2025, in exchange for preferred shares, and Pierce and Walker received substantial consideration for that contribution. Pierce and Walker purportedly abandoned that agreement and entered into a new agreement that was far less advantageous for DNA and its stockholders in that it allowed Pierce and Walker to withdraw the assets.  Permitting the withdrawal would complete the destruction of DNA as a going concern, eliminate the primary asset available to satisfy the claims asserted herein, and render this litigation an empty exercise. The harm to Pierce and Walker from being required to maintain the status quo during litigation is de minimis compared to the existential harm to DNA from losing its only substantial asset.

138.    The public interest favors injunctive relief. Allowing controlling insiders to fraudulently induce investment into a company, extract maximum value through self-dealing, deliberately destroy the company to facilitate asset reclamation, and then withdraw the company's sole remaining asset ahead of a contractual deadline they secretly negotiated for themselves would undermine the fundamental protections that corporate law and federal securities law provide to minority investors and would reward precisely the conduct that RICO, the Exchange Act, and state fiduciary duty law are designed to deter.

139. Derivative Plaintiffs therefore seek a preliminary and permanent injunction, enjoining Pierce and Walker from: (a) removing, transferring, assigning, selling, pledging, encumbering, or otherwise disposing of the Assets or any interest therein outside the ordinary course of DNA's business without prior approval of this Court; (b) causing or directing any entity owned or controlled by Pierce or Walker, including but not limited to Percival Services LLC, RNA LLC, and any successor or affiliated entity, to take any action with respect to the Assets; (c) causing DNA to enter into any transaction with Pierce, Walker, or any entity they own or control without prior approval of this Court; (d) taking any action to wind down, dissolve, or otherwise liquidate DNA without prior approval of this Court and distribution of the Assets to DNA's shareholders in accordance with their respective ownership interests; and (e) interfering with DNA's ability to pursue the claims asserted in this action or to retain independent counsel and management to conduct DNA's affairs.

### COUNT 7: Derivative Claim for Imposition of Constructive Trust
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

140. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1 and the equitable powers of this Court.

141. A constructive trust is an equitable remedy imposed by courts to prevent unjust enrichment when a person holds property under circumstances in which it would be inequitable to permit retention of the beneficial interest. Constructive trust is appropriate where: (a) a confidential or fiduciary relationship exists between the parties; (b) a promise, express or implied, was made with respect to the property; (c) a transfer of property was made in reliance on that promise; and (d) allowing the transferor to retain the property would result in unjust enrichment. All four elements are satisfied here.

142. First, Pierce and Walker stood in a fiduciary relationship with DNA and its minority shareholders at all relevant times. As the sole controlling managers and majority owners of DNA, Pierce and Walker owed DNA duties of loyalty, care, and good faith that gave rise to a relationship of trust and confidence with respect to DNA's assets and affairs.

143. Second, Pierce and Walker made express and implied promises with respect to the Assets. The Written Consent executed September 22, 2025 expressly promised all other DNA shareholders that Pierce and Walker would "contribute significant personal assets to [DNA] to assist it in its goals." The Agreement for the Contribution of Additional Capital Assets executed September 28, 2025 formally memorialized the specific Assets to be contributed, but also attempted to give Walker and Pierce a backdoor way to reclaim the assets without disclosure to DNA stockholders.

144. Third, DNA and its shareholders, employees, and counterparties transferred substantial property and performed substantial obligations in reliance on Pierce and Walker's promises concerning the Assets. McLaughlin transferred Coral Capital Management LLC and its $125 million in assets under management to DNA. Flaherty and his wife Paige Larkin transferred $750,000 in cash. Matthews left a prestigious position to serve as CEO. Nash undertook extensive audit preparation work as CFO. Miglio provided months of legal and strategic services. BitAgent accepted reduced ownership terms in its acquisition by DNA. Each of these transfers was made in express reliance on the representation that the Assets had been or would be permanently contributed to DNA and would provide the foundation for a NASDAQ-listed public company.

145. Fourth, permitting Pierce and Walker to reclaim the Assets would result in gross unjust enrichment. Pierce and Walker received substantial consideration for the Asset contribution in the form of preferred shares in DNA, enhanced credibility and reputation that allowed them to

recruit high-caliber executives and attract investors, the services of Matthews, Nash, Miglio, and others who worked for months in reliance on the Asset contribution, and the operational infrastructure and capital contributed by McLaughlin and Coral. Having received all of this consideration, it would be unconscionable to permit Pierce and Walker to now reclaim the Assets — the primary asset of the company they built on the backs of others' contributions — by invoking a secret reverter clause that was never disclosed to DNA's other shareholders, employees, or counterparties.

146. The constructive trust extends to all Assets currently held by DNA, including but not limited to: 199 coins of bitcoin; 9.32% of BCAP Fund I LP; the 27.5% distribution interest of BCAP Fund II GP (including the Tether Rights); the 1.02% interest in BCAP Fund II LP; 237,637 shares of BCAP Fund III LP; and all proceeds, distributions, appreciation, or other value derived from any of the foregoing (collectively, the "Trust Assets"). The constructive trust further extends to any Asset that Pierce or Walker have already transferred, encumbered, or removed from DNA in breach of their fiduciary duties, including any proceeds thereof currently held by Pierce, Walker, Percival Services LLC, RNA LLC, or any other entity they own or control.

147. Derivative Plaintiffs therefore request that this Court impose a constructive trust over the Trust Assets for the benefit of DNA, declare Pierce and Walker to be constructive trustees of the Trust Assets, order Pierce and Walker to account for all Trust Assets and any proceeds or distributions received therefrom, and order the immediate transfer of all Trust Assets and any proceeds thereof to DNA or to a receiver appointed by this Court to administer DNA's affairs pending resolution of this action.

**COUNT 8: Derivative Claim for Breach of Contract**
**(By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)**

148. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs

by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

149. The Written Consent of a Majority of the Stockholders of DNA Holdings Venture, Inc. (the "Consent Agreement") is a valid and binding contract between Pierce, Walker, and DNA. Under the Consent Agreement, Pierce and Walker expressly agreed to transfer the Assets to DNA "to facilitate growth and potentially engage a merger that would lead to public market transactions." In entering into the Contribution Agreement, DNA provided substantial consideration including the issuance of preferred shares to Pierce and Walker and the continuation of all business operations, professional services, and merger negotiations that depended upon Walker and Pierce's agreement to "contribute significant personal assets" to DNA in exchange for preferred shares.

150. Pierce and Walker materially breached the Consent Agreement in the following respects: (a) Pierce and Walker failed to make the Asset contributions in a form that actually transferred title and full control of the Assets to DNA — instead structuring the transfer through layered entities in a manner that preserved their practical ability to reclaim the Assets notwithstanding the formal contribution; (b) anticipatorily breaching the Consent Agreement by indicating a plan to reclaim the Assets on March 27, 2026.

151. As a direct and proximate result of these breaches, DNA has suffered damages including: the loss of the full benefit of the Asset contribution that DNA was promised; the costs and professional fees incurred in pursuing the NASDAQ merger that was sabotaged; and the loss of the going concern value that the merger would have created. DNA is also entitled to specific performance of the Consent Agreement requiring Pierce and Walker to formally and irrevocably contribute the Assets to DNA free of any reverter or reclamation mechanism. Any monetary

recovery on this Count shall be paid to DNA.

## COUNT 9: Derivative Claim for Fraudulent Transfer
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

152. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1 and the Uniform Voidable Transactions Act as adopted in the applicable jurisdiction.

153. Any transfer of the Assets from DNA to Pierce, Walker, or any entity they own or control pursuant to the reverter clause or otherwise would constitute a fraudulent transfer voidable under the Uniform Voidable Transactions Act ("UVTA"). The UVTA permits avoidance of any transfer made by a debtor: (a) with actual intent to hinder, delay, or defraud creditors; or (b) without receiving reasonably equivalent value in exchange, where the debtor was insolvent at the time of the transfer or became insolvent as a result of it.

154. Any Asset withdrawal by Pierce and Walker would satisfy the actual intent standard under the UVTA. Courts consider the following "badges of fraud" as evidence of actual fraudulent intent, each of which is present here: (a) the transfer would be made to insiders — Pierce and Walker are DNA's controlling managers and majority owners; (b) DNA has been sued and the transfer would occur during the pendency of this litigation; (c) the transfer would be of substantially all of DNA's assets, leaving it an empty shell unable to satisfy any judgment; (d) the transferees — Pierce and Walker — are the same persons who caused DNA's insolvency through the fraudulent scheme described herein; (e) the reverter mechanism was concealed from DNA's creditors and shareholders, indicating consciousness of its impropriety; (f) the value of the Assets has dramatically increased since contribution — the Tether Rights alone may now be worth in excess of $1 billion — giving Pierce and Walker a powerful financial motive to effect the transfer

p. 56

immediately; and (g) Pierce and Walker have already taken steps in furtherance of the transfer, including the December 16, 2025 call seeking to reclaim all but $50 million of Pierce's Assets and Walker's February 2026 statement that DNA shares were worthless.

155. Any Asset withdrawal would also satisfy the constructive fraud standard under the UVTA. DNA has little to no cash and is effectively insolvent — the Assets are its only material property. Withdrawal of the Assets would render DNA unable to pay any of its existing obligations, including the claims asserted by Derivative Plaintiffs herein, who are creditors of DNA within the meaning of the UVTA. DNA would receive no reasonably equivalent value in exchange for the Asset withdrawal, as the reverter clause returns the Assets to Pierce and Walker while leaving DNA with only the liabilities and operational losses that accumulated during the period of the contribution.

156. The UVTA fraudulent transfer claim also reaches Pierce's prior transfer of the Tether Rights and other Assets through the layered entity structure of Percival Services LLC to RNA LLC and then to DNA — to the extent any aspect of that structured transfer was designed to complicate future recovery or obscure the chain of title to the Assets, it constitutes a fraudulent transfer in its own right. Pursuant to the UVTA, Derivative Plaintiffs seek avoidance of any such transfer, attachment of the Assets, an injunction against further disposition, appointment of a receiver, and any other relief available under the UVTA. Any recovery on this Count shall be paid to DNA.

### COUNT 10: Derivative Claim for Unjust Enrichment and Disgorgement
#### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

157. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

158. Walker and Pierce were unjustly enriched at DNA's direct expense through the following means, among others: (a) diverting DNA investor capital to fund personal luxury travel, accommodations, and events; (b) receiving personal advisory tokens and kickbacks from ICO companies at preferential terms not available to DNA; (c) receiving compensation and management fees from DNA while simultaneously destroying its value; and (d) structuring the Asset contribution with a secret reverter to reclaim Assets whose value has dramatically increased while DNA bore the costs and liabilities of pursuing the public offering strategy those Assets were intended to support.

159. It would be inequitable and unconscionable to permit Walker and Pierce to retain these benefits. DNA is entitled to restitution and disgorgement of all amounts by which Walker and Pierce were unjustly enriched at its expense, in an amount to be determined at trial. Any recovery on this Count shall be paid to DNA.

### COUNT 11: Derivative Claim for Corporate Waste
### (By All Derivative Plaintiffs on Behalf of DNA Against All Defendants)

160. Derivative Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein. This Count is asserted derivatively on behalf of DNA pursuant to Federal Rule of Civil Procedure 23.1.

161. Corporate waste occurs when corporate assets are transferred or expended for no or grossly inadequate consideration, or when a corporation enters into transactions so one-sided that no business person of ordinary, sound judgment could conclude they were in the corporation's interests. Pierce and Walker caused DNA to commit waste in numerous specific instances, including but not limited to the following: (a) Entering into and maintaining the White Fiber contract, which required DNA to pay White Fiber millions of dollars to mine ATH tokens at a cost per token that substantially exceeded the token's market value, creating a guaranteed and

substantial recurring loss for DNA with no rational business justification — particularly given Pierce's undisclosed conflict of interest as a board member of White Fiber's parent company; (b) committing DNA investor capital across approximately 36 ICO advisory agreements that generated little, if any, cash revenue or profitable outcomes, while Pierce and Walker extracted personal advisory tokens from those same agreements at preferential terms; (c) diverting DNA's limited cash resources to fund Pierce's and Walker's personal luxury travel, private jets, private yachts, five-star hotels, and DNA House events worldwide — expenditures that served Pierce's and Walker's personal lifestyles rather than any legitimate corporate purpose; (d) rejecting at least three cash-paying advisory deals sourced by Jake Flaherty in December 2025 and January 2026 that would have generated immediate revenue for a cash-starved DNA; (e) rejecting at least two third-party offers to invest not less than $10 million in cash into DNA at a time when DNA had little to no cash on hand; and (f) using DNA's credibility and platform to publish a materially misleading research report on AGPU on January 15, 2026, exposing DNA to securities fraud liability while generating no legitimate consideration for DNA.

162. No person of ordinary, sound business judgment could have concluded that these transactions and expenditures were in DNA's best interests. The waste was compounded by the fact that Pierce and Walker rejected value-creating transactions and investment opportunities at the same time they were approving the wasteful transactions described above, demonstrating that their decision-making was driven by personal self-interest rather than any rational business judgment on DNA's behalf. As a direct and proximate result of this corporate waste, DNA has suffered damages in an amount to be determined at trial. Any recovery on this Count shall be paid to DNA.

## JURY DEMAND

163. Derivative Plaintiffs demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Derivative Plaintiffs, on behalf of nominal defendant DNA Holdings Ventures, Inc., respectfully pray that: (i) judgment be entered in DNA's favor, (ii) judgment be entered against all Defendants, and (iii) relief be granted as follows:

a. Compensatory damages payable to DNA in an amount to be determined at trial, including all losses arising from the fraudulent scheme, the destroyed merger opportunity, the White Fiber/ATH losses, diverted investor capital, and the destruction of DNA's going concern value;

b. Disgorgement and restitution to DNA of all profits, compensation, advisory tokens, kickbacks, personal benefits, and other amounts unjustly received by Walker and Pierce at DNA's expense, as determined at trial;

c. Treble damages payable to DNA pursuant to 18 U.S.C. § 1964(c);

d. An injunction prohibiting Walker and Pierce from removing, transferring, encumbering, or otherwise disposing of the Assets or any other property of DNA during the pendency of this action;

e. A permanent injunction, following trial on the merits, permanently enjoining Pierce and Walker from: (i) removing, transferring, assigning, selling, pledging, encumbering, or otherwise disposing of the Assets or any interest therein outside the ordinary course of DNA's business without prior Court approval; (ii) causing or directing any entity owned or controlled by Pierce or Walker, including Percival Services LLC, RNA LLC, or any successor or affiliated entity, to take any action with respect to the Assets; (iii) causing DNA to enter into any transaction with Pierce, Walker, or any entity they own or control without prior Court approval; (iv) taking any action to wind down, dissolve, or liquidate DNA without prior Court approval and equitable distribution of the Assets; and (v) interfering with DNA's ability to pursue the claims asserted herein or to retain independent counsel and management;

f. Imposition of a constructive trust over the Assets and all proceeds thereof — including the 199 coins of bitcoin; the 9.32% interest in BCAP Fund I LP; the 27.5% distribution interest of BCAP Fund II GP (including the Tether Rights); the 1.02% interest in BCAP Fund II LP; and 237,637 shares of BCAP Fund III LP — for the benefit of DNA; a declaration that Pierce and Walker hold such Assets as constructive trustees for DNA; and an order requiring Pierce and Walker to account for all Assets and any proceeds, distributions, or appreciation therefrom and to immediately transfer all such Assets and proceeds to DNA or to a Court-appointed receiver;

g. An award to Derivative Plaintiffs of reasonable attorneys' fees, costs, and

p. 60

expenses incurred in this action pursuant to the corporate benefit doctrine, 18 U.S.C. § 1964(c), and applicable law;

h. Appointment of an independent receiver or special master pursuant to Federal Rule of Civil Procedure 66 to take custody of the Assets, manage DNA's affairs during the pendency of this action, and prevent further dissipation, encumbrance, or removal of corporate property; and

i. Such other and further legal or equitable relief as the Court deems just and proper under the circumstances.

j. A declaration pursuant to 28 U.S.C. § 2201 that: (i) the March 27, 2026 reverter clause in the Agreement for the Contribution of Additional Capital Assets is void, invalid, and unenforceable; (ii) Pierce and Walker have no right to withdraw, transfer, or encumber the Assets by operation of the reverter or otherwise; (iii) the Assets are the property of DNA and shall remain so until further order of this Court; and (iv) any purported exercise of the reverter by Pierce or Walker is void ab initio and without legal effect;

k. Specific performance of the Written Consent, requiring Pierce and Walker to formally, irrevocably, and unconditionally contribute the Assets to DNA free of any reverter, reclamation mechanism, or encumbrance;

l. Avoidance of any fraudulent transfer of the Assets pursuant to the Uniform Voidable Transactions Act, attachment of the Assets pending judgment, and recovery of the Assets or their value for the benefit of DNA; and

m. Such other and further legal or equitable relief as the Court deems just and proper under the circumstances.

Dated: March 26, 2026

*/s/ Ryan Downton*_____
Ryan Downton
Texas Bar No. 24036500
THE TEXAS TRIAL GROUP, P.C.
875 Carr 693, Ste. 103
Dorado, PR 00646*
Telephone: (512) 680 7947
Email: ryan@thetexastrialgroup.com
*Downton is licensed in Texas not Puerto Rico

*Attorneys for Derivative Plaintiffs*

p. 61

## **COMPLAINT VERIFICATION**

The undersigned Derivative Plaintiff hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that: (i) he/she has reviewed the foregoing Verified Shareholder Derivative Complaint; (ii) he/she has been continuous shareholders of DNA Holdings Ventures, Inc. since the dates set forth in the Parties section above and were shareholders at the time of each transaction and wrongful act complained of herein; (iii) he/she continue to hold their respective ownership interests in DNA as of the date of this verification; and (iv) to the best of his/her knowledge, information, and belief, the allegations contained herein are true and correct.

Executed on March 26, 2026.

Signed by:

*Tim Flaherty*

76920F7898F141E...

Tim Flaherty

Docusign Envelope ID: 2EE91539-0B53-47A9-97FF-15C0597454F6

## COMPLAINT VERIFICATION

The undersigned Derivative Plaintiff hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that: (i) he/she has reviewed the foregoing Verified Shareholder Derivative Complaint; (ii) he/she has been continuous shareholders of DNA Holdings Ventures, Inc. since the dates set forth in the Parties section above and were shareholders at the time of each transaction and wrongful act complained of herein; (iii) he/she continue to hold their respective ownership interests in DNA as of the date of this verification; and (iv) to the best of his/her knowledge, information, and belief, the allegations contained herein are true and correct.

Executed on March 26, 2026.

DocuSigned by:

5407B6737CC24AA...
Paige Larkin

p. 1